UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARK MILLER,

      Plaintiff,

v.                                                    Case No. 8:07-cv-1506-T-24 EAJ

LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON,

      Defendant.
_____/

## **ORDER**

This cause comes before the Court on the parties' cross motions for summary judgment. (Doc. Nos. 15, 20, 21, 22.) Plaintiff Mark Miller brought this suit to recover short term disability ("STD") and long term disability ("LTD") benefits against Defendant Liberty Life Assurance Company of Boston ("Liberty Life") under a welfare benefit plan ("Plan") governed by the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001, *et. seq.* ("ERISA").

**I.    Background**

Plaintiff Mark Miller filed this suit seeking to recover STD and LTD benefits. The STD and LTD Plans were established and sponsored by Plaintiff's employer, Liberty Mutual Insurance Company ("the Sponsor"), for the benefit of its participating employees and their dependents. Defendant Liberty Life insured the LTD Plan, but it did not insure the STD Plan, which is fully funded by the Sponsor. Liberty Life had discretionary authority to make interpretations and determine eligibility under both the STD and LTD Plans.

Plaintiff contends that there are essentially two issues before this Court: (1) whether he satisfied the applicable plan provisions for recurrent STD benefits; and (2) whether the conflict

of interest for Liberty Life so infected the decisions made regarding Plaintiff's short term and long term disability benefits that they rendered the denial of benefits unreasonable.

The parties do not dispute the objective medical evidence in this case and rely almost entirely on the administrative record. These are the essential facts:

### A. Tibial Tendon Repair Claim

Plaintiff was employed as an Insurance Sales Representative for Liberty Mutual Insurance Company since January 31, 1983. (AR 53.) On July 15, 2004, Plaintiff had surgery to repair a tear of the left posterior tibial tendon. (STD-AR 231.) On July 19, 2004, Plaintiff made a claim for benefits under the STD Plan, stating that his date of disability was July 15, 2004. (STD-AR 20-21.) Liberty Life opened claim number 1245550 based on disability caused by "left tibia tendon repair." (STD-AR 20.)

Plaintiff's claim was approved, and after a seven-day elimination period, he began receiving STD benefits on July 22, 2004. (STD-AR 221.) The claim was initially approved for payment through August 20, 2004. (STD-AR 19 at note 8.) However, Liberty Life later extended Plaintiff's STD benefits through September 3, 2004, in light of Plaintiff's continuing physical therapy and Dr. Dofi Herscovici's request that Plaintiff remain out of work until his next office visit. (STD-AR 19 at note 14; STD-AR 305.)

On September 9, 2004, Liberty Life contacted Plaintiff and requested updated medical information. (STD-AR 18 at note 6.) Plaintiff agreed to call Dr. Herscovici to obtain additional medical information, and Liberty Life agreed to extend benefits through September 17, 2004. (STD-AR 18 at note 6.) On October 1, 2004, Liberty Life received an undated Physical Capacities Form from Dr. Herscovici, stating that Plaintiff could not perform any activities,

including sitting, standing, walking, reaching, pulling, pushing, or lifting. (STD-AR 290.) Dr. Herscovici did not include any medical documentation to support his conclusion. Liberty Life requested medical records to support the Physical Capacities Form and stated that benefits could not be extended without them. (STD-AR 16 at notes 11 &12; STD-AR 17 at note 10.)

On October 26, 2004, Liberty Life had a nurse review Plaintiff's file, including notes from Plaintiff's physical therapy. (STD-AR 15-16.) The nurse determined that "there is no physical assessment nor subsequent medical evidence to support any [restrictions and limitations] that would preclude [claimant] from being able to drive [and] perform sustained sedentary activities." (STD-AR 15-16.) As a result of this determination, Liberty Life sent a letter to Plaintiff on October 28, 2004 advising that benefits would not be payable beyond September 17, 2004. (STD-AR 256.)

On November 5, 2004, Plaintiff appealed the termination of STD benefits and provided Liberty Life with copies of Dr. Herscovici's records. (STD-AR 243-255.) Liberty Life reviewed the records and determined that an additional week of benefits were payable, granting STD benefits through September 24, 2004. (STD-AR 219.) On December 6, 2004, Plaintiff appealed this decision as well and stated that he was now suffering from shoulder pain due to an incident that occurred on October 11, 2004 when he was using crutches necessitated by the tibial tendon surgery. (STD-AR 210.)

On December 14, 2004, Dr. Herscovici examined Plaintiff and wrote in his office notes as follows:

> As to his foot, I have told him that given the fact that his company is willing to let him return to sedentary work and pay 100 percent of his salary, I see no reason why he cannot return to work. This is a completely sedentary position for him, which will not require him to do any other lifting. I have told him, given these

3

restrictions, I have no personal reason why he should have to remain out of work." (STD-AR 136.) Liberty Life referred the appeal to a nurse reviewer for evaluation. She concluded that "there does not appear to be sufficient objective medical findings that would preclude the safe ability to perform sedentary activities with the ability to elevate his leg." (STD-AR 7-8.) As a result, on December 27, 2004, Liberty Life upheld the denial of benefits beyond September 24, 2004, emphasizing that Plaintiff's employer "indicated that they are able to accommodate 100% sedentary activity with the ability to elevate your foot." (STD-AR 163-64.)

On March 28, 2005, Plaintiff's sister wrote a letter to Liberty Life seeking another review of the termination of Plaintiff's STD benefits. (STD-AR 125-28.) Liberty Life agreed to re-open Plaintiff's claim for an additional administrative review. (STD-AR 121-23.)

As part of the second administrative appeal, Liberty Life submitted Plaintiff's STD claim for an independent peer review by an orthopedic surgeon, Dr. John Wagner. (STD-AR 67-89.) Dr. Wagner prepared a 21-page report of his findings. He opined that Plaintiff "would have been capable of returning to sedentary activities in an occupational setting from September 24, 2004 through October 30, 2004 [and that it] . . . would be at this time, October 30, 2004, that the medical evidence supports that [Plaintiff] would be able to function in an occupational setting in a full-time basis at a light level as defined by the United States Department of Labor, Dictionary of Occupational Titles." (STD-AR 61.) As a result, on June 9, 2005, Liberty Life advised Plaintiff that it had reconsidered his claim and approved STD benefits through October 30, 2004. (STD-AR 31-35.)

4

### B. Spinal Injury Claim

On February 17, 2005, while his first claim was pending, Plaintiff submitted a second claim to Liberty Life, in which he claimed disability as the result of an "unknown upper spinal injury." (AR 52 at note 2.) Liberty Life opened claim number 2035325 for this claim. (AR 53.)

Plaintiff's employer provided Liberty Life with a new Physical Job Evaluation Form that reflected the modified duties for Plaintiff's job upon his return to work in January 2005. (AR 484.) In that form, Plaintiff's supervisor, Teresa Myers, detailed that Plaintiff's job duties consisted of the following: 45% of time devoted to prospecting by outbound telephone calls; 5% of time devoted to mailing letters; 45% of time devoted to writing policies; and 5% of time devoted to answering inbound calls. (AR 484.) Plaintiff's job primarily required sitting, walking, and standing, with only 5% of the day requiring reaching, 2% requiring bending, and 2% requiring stooping. (AR 484.) The lifting requirement of the job was 10 pounds or less. (AR 484.)

Liberty Life reviewed an office note dated March 1, 2005 from Dr. Herscovici, in which he wrote that he would defer to Drs. Leffers and Weinstein regarding Plaintiff's shoulder and neck complaints, but that from his point of view, Plaintiff could do sedentary work, could drive, and the only restrictions would be lifting, climbing, and long distance traveling. (AR 472.)

On May 6, 2005, Dr. Leffers wrote a letter to Liberty Life explaining that Plaintiff had undergone MRIs of the cervical spine that revealed spondylosis at C5-6 and C6-7. (AR 438.) Dr. Leffers' partner, Dr. Small, diagnosed Plaintiff with multilevel stenosis at C4-5 through C6-7. On May 11, 2005, Dr. Small performed an anterior cervical diskectomy with cervical fusion and internal fixation at C5-6 and C6-7. (AR 432-33.)

On May 20, 2005, Liberty Life granted Plaintiff's claim for STD benefits for his second claim (regarding his spinal injury) based on a date of disability of February 7, 2005. (AR 429-30.) He was paid STD benefits through August 7, 2005 (the maximum period) regarding this claim. (AR 398.)

While determining whether Plaintiff's second claim warranted LTD benefits as of August 8, 2005, Liberty Life had an orthopedic surgeon, Dr. Michael Geoghegan, perform an independent peer review of Plaintiff's two claim files. (AR 390-91.) Dr. Geoghegan concluded that Plaintiff could return to full time sedentary work, with limitations of lifting/carrying restricted to 10 pounds on an occasional basis; static neck posturing restricted to 60 minutes at a time; and reaching restricted to an occasional basis. (AR 378.) However, Dr. Geoghegan also concluded that the available medical evidence did not support any type of restrictions relating to sitting, standing, or walking. (AR 378.)

On August 29, 2005, Liberty Life sent Dr. Geoghegan's report to Dr. Small and solicited Dr. Small's opinion regarding Dr. Geoghegan's conclusion. (AR 373.) Liberty Life requested a response from Dr. Small by September 12, 2005, but it never received a response. (AR 373.)

On September 14, 2005, Liberty Life referred Plaintiff's file for a vocational assessment to determine whether the restrictions and limitations described by Dr. Geoghegan would prevent Plaintiff from performing the occupation of Insurance Sales Representative as it is performed in the national economy. (AR 368.) The vocational consultant, Catherine Chandick, reviewed Plaintiff's file and concluded that he was able to perform his own occupation. (AR 368.)

To be disabled under the terms of the LTD Plan, during the first 18 months, the claimant must be "unable to perform all of the material and substantial duties of his occupation on an

6

Active Employment basis because of an Injury or Sickness." (AR 6.) On September 16, 2005, Liberty Life terminated Plaintiff's claim for LTD benefits (relating to his spinal injury) as of that date, stating:

> Based on research performed by a Vocational Consultant, your *job* as a Sales Representative is most closely related to the occupation of Sales Representative in the national economy. The *occupation* of Sales Representative is performed in two basic ways in the national economy. One way involves traveling to meet with customers and the other is done in an office setting using a telephone and computer to communicate with customers. There are many positions in the national economy for both inside and outside Sales Representatives. The claimant is able to perform Inside Sales Representative positions and also some Outside Sales Representative Positions (If lifting is limited to 10 pounds maximum). Conclusion: The claimant is able to perform his own occupation in the national economy.
>
> The requirements of your occupation of Sales Representative are within your functional capabilities, and therefore, you are capable of performing your occupation with a different employer.
>
> Based on your ability to perform the duties of your occupation as it exists in the national economy, you do not meet your policy's definition of disability.

(AR 366-67.)

On March 16, 2006, Plaintiff appealed the termination of his LTD benefits relating to his spinal injury. Enclosed with his appeal was the March 2, 2006 report of Dr. Small and a report dated February 28, 2006 of a vocational evaluation conducted by Hal Heitler. In his March 2, 2006 report, Dr. Small stated that Plaintiff had a restricted range of motion, which limited him to working a total of two hours per day of light duty work. (AR 318.) In his February 28, 2006 report, Heitler concluded that because Dr. Small only released Plaintiff for sedentary work, Plaintiff could not return to work and perform all of the material and substantial duties of his occupation. (AR 334-35.)

7

On April 26, 2006, Liberty Life also reviewed the medical records of Dr. Daniel Murphy that were submitted by Plaintiff. On September 1, 2005, Dr. Murphy began treating Plaintiff for shoulder pain and determined that Plaintiff had bilateral shoulder impingement syndrome. (AR 295-96.) Eventually, Plaintiff opted to have surgery on his right shoulder, which occurred on October 24, 2005. (AR 300.) Thereafter, on January 4, 2006, Dr. Murphy's impression was that the surgery had resolved the pain in Plaintiff's right shoulder and that he would see Plaintiff on an as-need basis. (AR 305.)

In May of 2006, Liberty Life forwarded Plaintiff's files to an orthopedic surgeon, Dr. Plunkett, for review. Dr. Plunkett concluded that the medical evidence substantiated impairment through December 7, 2005, which allowed for a six week recovery period after Plaintiff's October 24, 2005 shoulder surgery. (AR 283.) Furthermore, Dr. Plunkett concluded that after December 7, 2005, Plaintiff would be able to perform sedentary work, with restrictions for lifting, carry, pushing, pulling, and reaching. (AR 282-83.)

Thereafter, in June of 2006, Liberty Life sought the input of a second vocational consultant, David Carey, regarding Plaintiff's ability to return to his own occupation in light of the restrictions imposed by Dr. Plunkett. Carey agreed with Liberty Life's prior vocational consultant, Chandick, that the sales representative occupation is divided into two categories, with inside sales representatives typically performing sedentary work and outside sales representatives typically performing light duty work. (AR 264.) Carey concluded that from September 16, 2005 through December 7, 2005, Plaintiff was not able to perform his own occupation, but after December 7, 2005, Plaintiff was able to perform his own occupation, since it consisted of inside sales work. (AR 265.)

8

On June 15, 2006, Liberty Life informed Plaintiff that based on a review of the medical evidence, it had determined that Plaintiff was disabled through December 6, 2005, and as such, it reinstated LTD benefits relating to his spinal injury through that date. (AR 262.) However, Liberty Life concluded that:

> [T]he medical and clinical evidence on file does not establish that his upper extremity impairment is of a nature and severity, which would preclude him from performing the material and substantial duties of his own occupation effective December 7, 2005.
>
> The restrictions and limitations outlined in Dr. Plunkett's final assessment would not preclude Mr. Miller from performing his own occupation as Sales Representative as it is typically performed with employers in the national economy. The claimant's restrictions subsequent to 12/7/05 are consistent with the demands of his own occupation. This applies to Inside Sales work.

(AR 262-63.)

On December 11, 2006, Plaintiff appealed Liberty Life's decision terminating his LTD benefits as of December 7, 2005. In support of his appeal, Plaintiff submitted an opinion from Dr. Murphy, dated September 4, 2006, stating that Plaintiff was disabled from October 24, 2005 through December 24, 2005. (AR 189.) However, Dr. Murphy noted that as of January 4, 2006 (the last time he saw Plaintiff), Plaintiff's work restrictions were "none." (AR 189.)

Additionally, Plaintiff informed Liberty Life for the first time that he had been treated by a cardiologist, Dr. Rathinam Moorthy. Plaintiff submitted the June 6, 2006 report of Dr. Moorthy indicating that Plaintiff was diagnosed with dilated cardiomyopathy and had been totally disabled since May of 2005. (AR 171-72.)

Plaintiff also informed Liberty Life for the first time that he was being treated by a pain management doctor, Dr. Sidhom, since February of 2006. Dr. Sidhom gave Plaintiff epidural steroid injections in March, July, and September of 2006. (AR 187.)

9

Additionally, in his December 11, 2006 appeal, Plaintiff challenged Liberty Life's failure to treat his second claim (spinal injury) as a continuation of his first claim (tibial tendon injury) when determining his benefits. (AR 160-62.) Plaintiff contends that his spinal injury is related to his tibial tendon surgery, because his spinal injury resulted from his use of crutches after the tibial tendon repair surgery. (AR 161.)

Again, Liberty Mutual investigated Plaintiff's appeal and submitted his files for peer review by an orthopedic surgeon, Dr. Hereward Cattell, and cardiologist, Dr. Allen Tabibian. In his report, Dr. Cattell stated that based on the totality of Plaintiff's orthopedic conditions, he has evidence of impairment. (AR 113.) Dr. Cattell also stated that Plaintiff would be restricted in lifting, carrying, reaching, pushing, and pulling, but Plaintiff would not be restricted in sitting, standing, walking, and repetitive and fine motor hand activities. (AR 114.) Therefore, Dr. Cattell concluded:

> [T]he available medical evidence does substantiate orthopedic impairment from December 7, 2005, mainly due to residuals of his significant cervical surgery and his ongoing history of bilateral shoulder pain. . . . As of December 7, 2005, . . . [his restrictions] are consistent with a sedentary or light activity level as defined by the U.S. Department of Labor. . . . By January 4, 2006, Dr. Murphy himself indicated that [Plaintiff] was "much better" and, at that time, was discharged from his care. There were no subsequent findings to indicate any significant ongoing orthopedic impairment or postoperative complication to account for a more significant degree of impairment.

(AR 115.)

Also, with regard to the related nature of Plaintiff's spinal injury to his tibial tendon surgery, Dr. Cattell noted that during Plaintiff's convalescence after the tibial tendon surgery, he slipped while on crutches and strained his shoulder and neck. (AR 109.) However, Dr. Cattell further noted that "[a]fter extensive evaluation by Dr. Small and Dr. Murphy[, Plaintiff] was

10

observed to have cervical disc disease, which predated the previous injuries." (AR 111.)[1]

In Dr. Tabibian's report, he stated that he spoke with Dr. Moorthy regarding Plaintiff. Dr. Tabibian concluded that based on his review of Plaintiff's medical records and his discussion with Dr. Moorthy, Plaintiff is able to perform sedentary work as defined by the U.S. Department of Labor. (AR 98.) Dr. Tabibian stated that Plaintiff had moderate cardiac impairment, and as a result, he would be restricted from prolonged standing and walking and lifting more than ten pounds. (AR 98.)

On March 28, 2007, Liberty Life upheld its decision to terminate Plaintiff's LTD benefits as of December 7, 2005. (AR 84-88.) Thereafter, Plaintiff filed the instant case, in which he claims: (1) Liberty Life incorrectly calculated the period during which he was to receive STD benefits for his spinal injury; (2) Liberty Life calculated the amount of STD and LTD benefits incorrectly by using the wrong rate of biweekly pay;[2] and (3) Plaintiff should still be continuing to receive LTD benefits relating to his spinal injury.

---

[1] Likewise, George Companioni, an orthopedic surgeon who conducted an independent medical examination of Plaintiff, diagnosed him with "cervical spondylosis post surgery at C5/6/7 with a history of spondylosis at C3/4 and 4/5." (AR 64.) He further opined that "it is clear that these changes are long term" and "it would be hard to relate the difficulties with [Plaintiff's] neck to use of crutches." (AR 64.)

[2] Plaintiff did not address this claim in its summary judgment motion and response; therefore, the Court deems the claim abandoned.

**II.      Standard of Review**

Previously, when a court reviewed a denial of an ERISA-plan benefit, the court followed the following steps:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (*i.e.,* the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is "*de novo* wrong" and he *was* vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end the inquiry and affirm the decision.
> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams v. Bellsouth*, 373 F.3d 1132, 1137-38 (11th Cir. 2004)(footnotes and citations omitted). However, as to the sixth step in this analysis, the Eleventh Circuit Court of Appeals recently eliminated the heightened standard of review applicable when a conflict of interest is present. *Doyle v. Liberty Life Assurance Co. of Boston*, No. 07-10348, 2008 U.S. App. LEXIS 19752, at *17-19 (11th Cir. Sept. 18, 2008).  The Court overruled its precedent to "the extent it requires district courts to review benefit determinations by a conflicted administrator under the heightened standard." *Id.* at * 17-18.  The Court held that the existence of a conflict of interest instead "should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Id.* at * 18.  Furthermore, district courts are no longer instructed to employ the two-step, burden-shifting approach to determine whether the administrator's plan was tainted by self-interest. *Id.*  The Court

explained, "while the reviewing court must take into account an administrator conflict when determining whether an administrator's decision was arbitrary and capricious, the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Id.*

## III.   Discussion

Liberty Life moves for summary judgment, arguing that its decision to treat Plaintiff's tibial tendon injury and his spinal injury as two separate injuries rather than as one continuous disability, as well as its decision to terminate Plaintiff's LTD benefits, were not wrong, and even if they were wrong, they should be upheld because they were reasonable. The Court agrees. Based on the facts and the language of the STD and LTD Plans, the Court finds that these decisions were not *de novo* wrong; and, even if they were wrong, they were reasonable.

### A.   Plaintiff's STD Claims

Plaintiff argues that Liberty Life failed to provide him a "full and fair" review of his STD claims when it deemed the two STD claims as separate claims, rather than as one continuous period of disability. Plaintiff's initial period of disability, which occurred from July 22, 2004 through October 30, 2004, resulted from the surgical repair of his tibial tendon. Then, on October 11, 2004, while recovering from this surgery and using crutches, Plaintiff injured his shoulders and neck. Based on this subsequent spinal injury, Liberty Life again accepted him as disabled under the plan from February 7, 2005 through August 7, 2005. Plaintiff argues that because this second period of disability was caused by the first, it should have been treated as one continuous injury.

Plaintiff's argument, however, is inconsistent with the terms of the STD Plan and with

13

the evidence contained in the administrative record.  The STD Plan provides the following:

> If You Are Disabled Again:
> If you return to work and become totally disabled again from the same injury or illness within six months your recurrent disability will be considered as a continuation of the original disability and no new waiting period will apply. . . .
> A new Short-Term Disability benefit period begins only if you:
> (a)      have been back to work full-time at least six months and become totally disabled again due to the same injury or illness; or
> (b)      have returned to work full-time and become disabled due to an unrelated injury or illness.

Liberty Life's treatment of Plaintiff's spinal injury as a separate injury requiring a new benefit period to begin apart from his tibial tendon injury was not wrong.  The Plan provision clearly states that a recurrent disability will be deemed continuous if the participant becomes disabled again due to the "same injury or illness" within six months of returning to work; but, a new disability period will begin if the participant has returned to work and becomes disabled due to an unrelated injury or illness.  Because Plaintiff's subsequent spinal injury is not the "same injury or illness" as the injury to his tibial tendon, a continuation of the original disability period would not be proper under this provision of the Plan.  The Court rejects Plaintiff's argument that, because he suffered a spinal injury while using crutches necessitated by the tibial tendon repair, these should have been treated as "related" injuries.  Nothing in this provision allows for the continuation of the original disability period when the original injury causes an unrelated subsequent injury.

However, even if this provision could be interpreted reasonably to mean that Plaintiff's spinal injury was related to his tibial tear, such that they are one continuous disability, the administrative record does not support such a conclusion.  Rather, the record reveals that Plaintiff's subsequent disabling condition was the degenerative disease of cervical spondylosis,

rather than an acute trauma directly related to the use of crutches. After reviewing pre-operative x-rays of the cervical spine that revealed "significant cervical disease," Dr. Companioni concluded that "it is clear" that Plaintiff's cervical "changes are long term." (AR 62-64.) He further opined that "it would be hard to relate the difficulties with his neck to use of crutches." (AR 64.)

Plaintiff's treating physicians agreed. Dr. Small opined on April 14, 2005 that an MRI of the cervical spine revealed "old trauma with chronic degenerative changes of spine and discs from C4-C5 through C6-C7 level." (AR 455). Dr. Leffers also opined on May 6, 2005 that "the majority of [Plaintiff's] shoulder pain was from cervical spondylosis, C5-6 and C6-7 with radiculopathy." (AR 163.) Likewise, Dr. Cattell opined that "[a]fter extensive evaluation by Dr. Small and Dr. Murphy[, Plaintiff] was observed to have cervical disc disease, which predated the previous injuries." (AR 111.)

Accordingly, Plaintiff's argument that his two injuries should have been treated as one continuous injury is inconsistent with the Plan language and unsupported by the record. However, even if such an argument could be made under the terms of the Plan, it was not unreasonable for Liberty Life to reject Plaintiff's interpretation of the language of the Plan and find that the two injuries should not be treated as one.

  **B.** **Plaintiff's LTD Claim**

Plaintiff argues that Liberty Life's denial of his LTD benefits was wrong because, in deciding to terminate his LTD benefits, it improperly classified his position as "sedentary" in nature rather than "light duty." Plaintiff's own occupation, he contends, exceeds the applicable criteria for sedentary employment. Furthermore, Plaintiff contends that Liberty Life's peer

review physicians based their opinions on the incorrect assumption that his own occupation was sedentary in nature. In making this argument Plaintiff relies on the Dictionary of Occupational Titles page attached to Hal Heiler's report, which indicates that Plaintiff's position is "light" duty work.

The Court rejects this argument because Plaintiff's employer made it clear in describing the specific tasks and functions that he is required to perform that his position was sedentary. (AR 484). To be "disabled" under the terms of the LTD Plan, during the first 18 months, the claimant must be "unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or sickness." (AR 6.) Liberty Life had two separate vocational consultants assess the scope of his occupation, both of whom determined that the occupation of Insurance Sales Representative can be performed on a sedentary level in the national economy. (AR 264-65, 368.) Moreover, Plaintiff's employer modified his job duties when he returned to work in January 2005 such that he was still performing the occupation of Insurance Sales Representative, but he was doing so with strictly sedentary duty requirements. (AR 483, 484.) Thus, where both vocational consultants opined that Plaintiff could and should return to his own occupation on a sedentary basis, it was reasonable for Liberty Life to rely on those opinions in making its claim determination.

Additionally, the Court rejects Plaintiff's argument that the fact that Liberty Life denied him LTD benefits at the same time it granted him a waiver of life insurance premiums based on disability is evidence that Liberty Life maintained an inconsistent, and therefore improper, position regarding whether he was disabled. The record is devoid of any evidence whatsoever that establishes the circumstances under which a waiver of life insurance premium would be

granted. For instance, the record does not contain any facts regarding what medical information was submitted, who at Liberty Life determines when to issue a waiver, or what standards are applied in making such a decision. In fact, the waiver of premium (assuming one was granted in this case, a fact which is not conclusively established in the record) could have been granted as a matter of course without investigation, as Liberty Life suggests.

The only record evidence Plaintiff cites in support of this argument is the deposition testimony of Ms. Lisa Gray, an appeals review consultant for Liberty Life. Ms. Gray testified that she did not consult with the life insurance review unit before denying Plaintiff LTD benefits. (Gray dep. at 44-45.) This testimony reveals nothing about how life insurance premium waivers are granted, and certainly does not establish that Liberty Life maintained an inconsistent or improper position regarding the denial of LTD benefits.

As explained above, the Court finds that Liberty Life's decision to terminate Plaintiff's LTD benefits was not wrong. However, even if its decision was wrong, the Court finds that Defendant's decision was reasonable, based on the facts and the terms of the Plan. Plaintiff has failed to produce any evidence that Liberty Life's decisions were affected by the fact that it insured the LTD Plan. Accordingly, Defendant's decision to terminate Plaintiff's benefits was a reasonable decision that will be upheld by this Court.

**IV.     Conclusion**

It is **ORDERED AND ADJUDGED** that Liberty Life's motion for summary judgment (Doc. No. 20) is **GRANTED** and Miller's motion for summary judgment (Doc. No. 15) is **DENIED**. The Clerk is directed to enter judgment in favor of Defendant Liberty Life Assurance Company of Boston, to terminate any pending motions, and to close the case. The

pretrial conference previously scheduled for Friday, October 10th, 2008 is hereby cancelled, and this case is removed from the Court's November 2008 trial calendar.

**DONE AND ORDERED** at Tampa, Florida, this 8th day of October, 2008.

Copies to:
Counsel of Record

SUSAN C. BUCKLEW
United States District Judge